THE COURT: Go ahead.

MR. WALTERS: Thank you.

CROSS-EXAMINATION

BY MR. WALTERS:

Q Why were there two pictures of the same picture in the photo manager?

A So, what happens is when we put in a general description that the victim provides to us, the system automatically puts photographs into a database and they look through them individually.

We don't have any control as to what pictures go into the database.

Q So how many other cases where the same photo are, like, right next to each other, highlighting-- it does highlight, doesn't it? Well, if everyone--

THE COURT: What is the question?

Q It does highlight a particular person, doesn't it?

MR. TANNOUSIS: Objection.

A No.

THE COURT: The objection is overruled. The answer stands.

Q And the answer was?

THE COURT: No.

Q Well, any other people, like, the same person, like, four pictures of the same person, does that happen?

kg

A There are a couple of duplicates in that photo manager database that he viewed that day.

Q Now, did he tell you that he's seen a photo already, he already did an identification procedure, did he tell you that?

A No.

Q Would that have made a difference in what you do, if you knew that one of your colleagues went up to him and flashed that same photo, would that change what you do or would it even make sense to even show him the manager if he's seen a photo already?

That same exact photo, he saw it 24 hours before. Did he tell you that?

THE COURT: Okay, okay.

A No, he did not.

THE COURT: You did not know that Sergeant Zelinski had showed Mr. LaPierre a single photograph--

THE WITNESS: No, sir.

THE COURT: --two days before?

THE WITNESS: Not until months later.

Q So you know Sergeant Zelinski, right? You know him?

A I don't know him personally.

Q Well, wasn't he in Robbery?

A No.

Q He is, what, General Crime?
A I believe he is a patrol sergeant.
Q A sergeant. He is a supervisor of some sort, then, right?
A Yes.
Q Wouldn't it have been his obligation to let you know--
MR. TANNOUSIS: Objection as to his obligation.
THE COURT: Let me hear the end of the question and I will rule.
Finish the question.
Q Wouldn't it have been proper, knowing that there's going to be an identification procedure, to tell you that I already conducted one with a single picture, wouldn't that have been proper to tell you?
THE COURT: The objection is sustained.
MR. WALTERS: Well, let me rephrase.
Q His showing that single photo was totally improper for identification purposes, wasn't it?
MR. TANNOUSIS: Objection, he is testifying.
THE COURT: The objection is sustained.
Q Was it proper to show a single photo to an individual?
MR. TANNOUSIS: Objection.
Q Would it have been proper under police procedure to show a single photo?
THE COURT: The objection is sustained.

THE WITNESS: You want me to answer it?

THE COURT: When I say sustained, you don't have to answer the question.

THE WITNESS: Okay.

Q Would you have liked to have known that you're getting ready to show this person pictures that he has seen before--

MR. TANNOUSIS: Objection.

Q --by a member of your department?

THE COURT: Sustained.

Q At the time that you were doing this, did your have your application in for Robbery Squad?

MR. TANNOUSIS: Objection.

MR. MOBILIA: Objection.

THE COURT: Sustained.

Q Well, right after this arrest, you got bumped up to Robbery; isn't that right?

MR. TANNOUSIS: Objection.

THE COURT: Sustained.

Q Well, you said you were put in Robbery about two years ago, right?

THE COURT: Is that right, detective?

A Yes.

Q And exactly two years ago, this case started, right?

A I was put in Robbery when I got this case. I was already assigned to Robbery when I received this case.

kg

Otherwise, I wouldn't have received a robbery case, if I wasn't in Robbery doing investigations.

Q You are in Robbery?

A In Robbery.

Q So right around the time of this case, you had just started Robbery, right? The Robbery Squad?

A I was in there, yes, I was assigned to--

Q Right around the time of this case, right?

A Yes.

Q And you had training in investigatory procedures, right?

A Yes.

Q And you had training in identification procedures, right?

A Yes.

Q And one of the first things they told you is that you never show a witness a single photo unless you're being suggestive and you want the witness to pick out that photo?

MR. TANNOUSIS: Objection.

Q That's the first thing you learn, isn't it?

THE COURT: The objection is sustained.

Q Well, you did have classes in proper identification procedure, right?

A Yes.

Q And in the first class, probably, they told you, you

never show a single photo?

MR. TANNOUSIS: Objection.

MR. MOBILIA: Objection.

THE COURT: The objection is sustained.

MR. MOBILIA: Hearsay.

Q They teach you about what is a suggestive identification procedure and one that is not suggestive, where there's a real choice; they teach you that, don't they?

MR. TANNOUSIS: Objection.

THE COURT: The objection is sustained. Do you have anything else?

Q You ever show a single photo to a witness--

MR. TANNOUSIS: Objection.

Q --who is looking to see who it is? Do you ever do that?

THE COURT: Sustained.

Q Isn't that totally and utterly improper?

MR. TANNOUSIS: Objection.

THE COURT: Sustained.

Mr. Walters, please go onto another subject, if you wish to.

Q The subject is identification, isn't it? And you're an expert in identification, aren't you?

MR. TANNOUSIS: Objection.

THE COURT: Sustained.

Q You are an expert in carrying out identification procedures, right?

MR. TANNOUSIS: Objection.

MR. MOBILIA: Objection.

THE COURT: Sustained.

Q And this identification procedure violated every single thing you were taught; isn't that right?

MR. TANNOUSIS: Objection.

THE COURT: Sustained.

Q This was an improper procedure because you didn't know that the same photo that you're asking him to look for, he already seen it?

MR. TANNOUSIS: Objection.

MR. MOBILIA: Objection.

THE COURT: Sustained.

Okay, Mr. Walters, if there is nothing else--

MR. WALTERS: I have no further questions, your Honor.

THE COURT: Very good.

Any redirect by the People?

MR. TANNOUSIS: Just very brief, Judge.

REDIRECT EXAMINATION

BY MR. TANNOUSIS:

Q Detective, what number photo was Alex LaPierre looking at when he called you over?

A He was-- he looked at number 10.

Q So he looked at number 10. So he hadn't even looked at number 11, at that point; is that correct?

A Yes.

MR. TANNOUSIS: Thank you.

No further questions.

THE COURT: Any recross based upon the redirect examination?

MR. WALTERS: Yes.

RECROSS-EXAMINATION

BY MR. WALTERS:

Q Does that machine allow you to go forward as well as to go back?

A Yes.

Q And how do you know that he didn't flip over to the next one and then come back, how do you know that? You don't, do you?

MR. MOBILIA: Objection.

THE COURT: Overruled.

Do you know that?

A I had no control over-- they click through each picture.

THE COURT: Please just ask questions.

Q So you don't know whether he went to 10 and said, hmmm, and then went to 11, let me look at a couple of others,

kg

and then went back, and then pointed out to you that here he is in 10 and also in 11, I wonder why? Did he say that to you?

Did he say ever, You know, I've seen this picture before. As a matter of fact, it was last night--

THE COURT: Mr. Walters--

Q --did he say that?

THE COURT: You've asked a question.

Did he say anything like that?

THE WITNESS: No.

Q So he hid from you--

MR. TANNOUSIS: Objection.

Q --the very important fact that he knows who he's looking for because he saw a photo. He never told that to you, right?

MR. TANNOUSIS: Objection.

THE COURT: Sustained.

Q That would have been important to you in putting together this identification procedure?

MR. MOBILIA: Objection. Is there a question? It's an argument.

Q Well, here's the question, would it have been important for you to know that he had been shown the very picture that you're asking him to try to find, wouldn't that have been important for you to know?

MR. TANNOUSIS: Objection.

MR. WALTERS: I think the answer is yes. And I have no further questions.

MR. TANNOUSIS: I would object to the last comment.

THE COURT: The objection is sustained. The answer is stricken.

Detective, I want to ask you, did you know on October 29, 2016 that Sergeant Zelinski had shown a single photograph to Alex LaPierre on October 27th?

THE WITNESS: No, sir.

THE COURT: Was Sergeant Zelinski part of your command?

THE WITNESS: No.

THE COURT: All right.

Based upon my questions, any further questions by the People?

MR. WALTERS: Yes.

THE COURT: By the People first.

MR. TANNOUSIS: Very briefly, Judge.

REDIRECT EXAMINATION

BY MR. TANNOUSIS:

Q When an individual looks at photographs on the photo manager, the time is recorded, correct?

A Yes.

Q When an individual skips through a photograph, it's

recorded, correct?

A It just shows how many photos they viewed.

Q If Alex LaPierre went to number 11 and then went back to number 10, that would have been recorded, correct?

A I'm not sure, I'm not really--

Q But the times that they look at the photos is recorded; isn't that correct?

A Yes.

Q So would it reflect on the times of the recording, correct?

A Yes, it's time stamped as to the statement he said to me, when it was.

THE COURT: All right, Mr. Walters, anything with regard to my questions to Detective Hamilton?

MR. WALTERS: No, your Honor.

THE COURT: All right.

Thank you, detective, you may step down.

(Whereupon, the witness exits the courtroom.)

THE COURT: Ladies and gentlemen, Detective Hamilton has just testified that she asked Alex LaPierre to view photos at the Robbery Squad on October 29, 2016.

The police obtain photos of many people from a variety of sources, and for different purposes.

You must not infer from the fact that the police

obtained a photo of the defendant, that the defendant committed this or any other crime.

Do the People have any further witnesses?

MR. TANNOUSIS: Not currently, Judge, no. I would like--

THE COURT: Do you rest your direct case?

MR. TANNOUSIS: I would like to approach before I do that, Judge.

(Whereupon, an off the record discussion was held at the bench.)

THE COURT: Ladies and gentlemen, we will take a break, at this time.

Please do not discuss this case, do not begin to deliberate, do not form any opinion as to the guilt or non-guilt of the defendant. And please report to the Court any attempt to influence you or any members of the jury.

We will be with you as soon as possible.

COURT OFFICER: All right, follow me.

(Whereupon, the jury exits the courtroom.)

THE COURT: All right, at the bench conference we had just before the jury was asked to leave the courtroom, the People were undecided as to whether they were going to rest their direct case.

And as I understand it, Mr. Tannousis, correct me

if I'm wrong, that you were asking the Court for an in limine ruling as to whether, if the People fail to call Sergeant Zelinski, the Court would give a missing witness charge to the jury; is that correct?

MR. TANNOUSIS: Correct, Judge.

It's obviously our position that, I mean, Sergeant Zelinski would be testifying to a suppressed identification, which is why we're-- I was choosing not to call him.

But this morning, defense counsel alluded to the fact that he would be asking for a missing witness charge. And if--

Of course, I can make Sergeant Zelinski available to defense counsel for him to call him as a witness, if defense counsel wishes, but we do not believe that the People should be given a missing witness charge for not calling Sergeant Zelinsky, when the only thing he could testify to would be a identification procedure that was suppressed by your Honor.

MR. WALTERS: Your Honor, I'm sorry, that is not the only thing that he would be asked about. He would be asked about his entire involvement here. He would be asked about what could he possibly be talking about with a CW's father for 10, 15, 20 minutes when they were driving around the neighborhood.

THE COURT: Why would that be part of the People's direct case and how would it be part of the direct case?

MR. WALTERS: Because he is an original investigating officer, he has thoroughly placed identification in issue by what I would think is a blunder, and the People cannot hide that from the jury, when his name has been brought up multiple times.

He is absolutely central to the investigation of the second time and place of occurrence. He probably brought the young man to the precinct the day after.

There's a multitudeness (sic) number of things that he would be relevant to on the defense case. And certainly on the People's case. Because, again, he is the one who thoroughly, thoroughly blundered any subsequent I.D.

And now the People are going to attempt to hide him, to say he is not relevant. But he is absolutely central.

And, of course, I will be connecting him to complaining witness one and two, because after the bogus identification of the complaining witness one, they wanted to shore up their case and they're walking around with Mr. Abraham's picture and he pulled it out immediately, and that's probably the picture that Mr. Howard pulled

out. And so only he would know.

MR. TANNOUSIS: Judge, I think that defense counsel is making a lot of assumptions. I'd also like to note that Alexander LaPierre testified yesterday and said that he did not have such a discussion with his father.

So what relevant does it have what discussion Sergeant Zelinski had with the father in the car?

THE COURT: Well, okay, go ahead, finish.

MR. TANNOUSIS: Additionally to that, Judge, he is free to call Sergeant Zelinski as a witness.

MR. WALTERS: He is not in my control, your Honor, he is in the People's control. He is on the VDF as being, quote, police officers involved in this case. That ends it for me, your Honor, he is a missing witness if they don't call him.

I understand their reluctance, but they put him in that VDF, they made him a part of this case, and he is a part of this case.

And it goes beyond just showing the single photo. It's the other surrounding circumstances that we can explore, as well, as they should be explorable.

MR. TANNOUSIS: And I can make him available for defense counsel to call him as his own witness.

THE COURT: I've heard enough. If the People had called Officer Zelinski for the purposes of eliciting the

photographic identification of the defendant, the Court would not have permitted that.

First, because the Court, of course, had ruled that the procedure was unduly suggestive, and the People would be precluded from calling him.

There again, he does not have material information in regard to the commission of the crime. I would not give a material witness order-- witness charge, at this point.

So that's where we stand. So with that, are the People going to rest when the--

MR. TANNOUSIS: Yes.

THE COURT: With that, Mr. Walters, do you want the People-- and I will insist, that the People make Sergeant Zelinski available to defense counsel?

MR. TANNOUSIS: Yes.

THE COURT: Do you want him, Mr. Walters?

MR. WALTERS: Yes, Monday morning.

THE COURT: All right. He should have been here today. He really should have been here today.

MR. TANNOUSIS: I understand, Judge.

THE COURT: Because you should have been able to anticipate this situation.

MR. TANNOUSIS: Of course, defense counsel never told me that he planned to call him as a witness.

MR. WALTERS: Your Honor, let's make the record clear, on the first day of trial, when he was not on the witness list, the People then inserted him, and I made the claim the first day of trial that if he's not called, he's a missing witness and I deserve a missing witness charge.

THE COURT: There again, I remember the argument. But most importantly, I do remember Mr. Walters asking that Zelinski, at the very least, whether I ruled against him or not on the missing witness, that he be made available. We wasted a good part of the day.

He is not on duty today?

MR. TANNOUSIS: I will find out.

THE COURT: Could he be here at 2:15?

MR. TANNOUSIS: Can we have a five-minute recess to find that out?

THE COURT: Of course. All right, five-minute recess.

MR. TANNOUSIS: Thank you, your Honor.

(Whereupon, there is a pause in the proceedings.)

COURT CLERK: Recalling case on trial.

THE COURT: Mr. Tannousis, concerning the availability of Sergeant Zelinski?

MR. TANNOUSIS: Yes, Judge.

I contacted Sergeant Zelinski, I spoke to him, he is off from work today and he is home with his 10 month

old child.

I explained to him that your Honor asked that he come in today at two. He told me, okay, let me give you a call back in about a half an hour, to see if he can find someone to cover the baby.

He called me back, he said that his father is working, doesn't finish until five. His mother is in New Jersey and won't be back until well after two. And his wife is working in the city today.

I even offered to have someone in the D.A.'s office-- to have someone look after the child while he is testifying, and he actually told me his wife does not feel comfortable with a stranger looking after the child.

THE COURT: All right, so we will go to Monday for Sergeant Zelinski.

But let me tell you this, the way I'm going to address the schedule, I'm going to expect you to sum up on Monday.

What I will do is, once the testimony is complete, I will give you an hour or whatever is reasonable, but we will sum up on Monday. And I will charge on Wednesday, the 7th.

MR. WALTERS: Charge on Wednesday?

THE COURT: Yes, because we have Tuesday off for Election Day. So I will tell that to the jury. All

right?

And stay in the same place after the jury has been dismissed, because I just want to preliminarily go over with you the charges, which are the main thing, and what I had in mind and what input you would like to have, because I definitely have to give that to you before you sum up.

All right, please bring the jury.

MR. WALTERS: So, your Honor, the People are going to rest?

MR. TANNOUSIS: Yes, we will rest on the record.

THE COURT: And, Mr. Walters, after that if you want to make a motion, I'll hear that.

MR. WALTERS: Your Honor, just to give everyone a heads up, I have to think about--

THE COURT: Hurry, because the jury may be right out in the hallway.

MR. WALTERS: I'm going to think about the approach to Sergeant Zelinski. I'm a little troubled by my having to call him as my witness to explore these things, because, of course, when he is my witness, my ability to explore these things--

THE COURT: You will be given--

MR. WALTERS: --on direct are--

THE COURT: Of course, you will be given more

latitude.

MR. WALTERS: Well, will I be able to declare him a hostile witness?

THE COURT: Well, we'll see how hostile he is. And if we reach that point, I'll let you know.

MR. WALTERS: If he is polite, your Honor, he is still adversarial to me, even though he is my witness.

THE COURT: I'll keep that in mind and give you latitude. You are calling him for the purposes of establishing that your client was identified through a suggestive process. Let's see how it goes.

MR. WALTERS: Or not. On Monday. And if I don't call him and I don't call my client, then I will be immediately ready to sum up.

THE COURT: But in light of the fact that they might be prepared to cross-examine, I would give some time, so we will do that on Monday, all right?

I'm still going to tell the jury to come in at 10:00 on Monday.

(Whereupon, there is a short pause in the proceedings.)

COURT OFFICER: Ready for the jury, your Honor?

THE COURT: Yes, we are.

COURT OFFICER: Jury entering.

(Whereupon, the jury enters the courtroom.)

COURT CLERK: Are the jurors properly seated and satisfactory to the People?

MR. TANNOUSIS: Yes.

COURT CLERK: And to the defense?

MR. WALTERS: Yes.

THE COURT: All right, ladies and gentlemen, we are going to continue the testimony Monday morning. I have to adjust the schedule just slightly.

On Monday, I anticipate the close of evidence in this case. You will hear the summations of counsel on Monday. But I will charge you on Wednesday, the 7th.

Keep in mind, Tuesday is a public holiday, Election Day, so we're not open. So normally I would do it the next day, but that's why it will go to the next day. But I wish you a good weekend.

And just as a matter of business, do the People at this point rest their direct case?

MR. TANNOUSIS: Yes, at this time the People rest.

THE COURT: Thank you.

Ladies and gentlemen, please over the weekend do not discuss this case with anyone, do not begin to deliberate, do not form any opinion as to the guilt or non-guilt of the defendant.

Please report to the Court any attempts to

influence you or any members of the jury. Please do not go to any scene mentioned during the course of the trial to view it. Do not read, listen or view any news accounts of this trial, if there be any.

Please do not do any research in regard to any fact, person, issue or law in regard to this case.

And finally, I must remind you that you may not agree to accept or accept any payment or benefit for providing any information about this trial until the conclusion of the trial, when you will be discharged as a juror.

With that, have a good weekend. And I will see you at 10:00 Monday morning, November 5th. Thank you very much.

(Whereupon, the jury exits the courtroom.)

THE COURT: All right, counsels, I just-- at this point, this is my inclination in terms of the charges.

In regard to the alleged robbery on October 9th, I would charge the jury Robbery in the First Degree - displayed.

In regard to the alleged robbery on October 27th, I would charge first Attempted Robbery in the Second Degree - physical injury. And thereafter, charge Attempted Robbery in the Second Degree - aided by persons actually present. That's my inclination, at this point.

Are the People requesting any further charges or any lesser includeds?

MR. TANNOUSIS: Yes, Judge. As to the first incident, October 9th, we do request your Honor charge the jury with Robbery in the Second Degree, which is the aided--

THE COURT: Why?

MR. TANNOUSIS: Because the testimony from Mr. Howard was that there were two individuals that were there, as well, and we are asking that it be submitted as a lesser included. And he did identify one of those individuals.

THE COURT: Well, didn't he quite clearly say that the one he alleged was Mister--

MR. WALTERS: Abraham.

THE COURT: Abraham, pulled up a shirt and displayed-- he may not have been specific about, that he saw a pistol.

MR. TANNOUSIS: He did, yes.

THE COURT: So why do we need them arguing whether there were other people present?

MR. TANNOUSIS: Just in the event that maybe the jury thought possibly that although they believed Mr. Abraham was there, might not necessarily been the person that displayed the pistol.

THE COURT: That's just speculation. There's got to be a reasonable view of the evidence as it exists on the record. Okay, I will think about that request, but I doubt that I would charge that.

MR. TANNOUSIS: Okay.

THE COURT: Anything else by the People?

MR. TANNOUSIS: No.

THE COURT: Mr. Walters?

MR. WALTERS: Your Honor, that's with respect to lesser includeds and the charges only?

THE COURT: Just the substantive charges to be given to the jury.

MR. WALTERS: Those two as indicated by the Court is fine, your Honor.

THE COURT: Okay. So there again, although I will officially put you on notice on Monday, that would be my decision. And I will consider the People's request, but there again, I doubt it very much that I would submit that to the jury.

MR. WALTERS: Your Honor, with respect to other jury instructions outside of the charges--

THE COURT: We can do that between-- well, if you want to-- we have time, so--

MR. WALTERS: I mean, preliminarily--

THE COURT: Go ahead, I will hear you. Go ahead,

Mr. Walters.

MR. WALTERS: Your Honor, with regard to the adverse inference--

THE COURT: I'm going to give that. In regard to the photograph that was lost.

MR. WALTERS: On the bus, yes, yes, your Honor. I think the adverse inference charge should be a stronger charge. And I say that because we clearly have a Rosario violation, and it seems now to me that the picture being destroyed--

THE COURT: Well, it's lost, it's not destroyed, okay, or it can't be located.

MR. WALTERS: Okay. However, this officer testified that he made a comparison and he specifically declared that the photo that was sent to him by the bus doesn't resemble Mister--

THE COURT: Who testified to that?

MR. WALTERS: Sergeant Lutz testified he compared the picture of Mr. Abraham and the picture that was sent to him, and there was no similarity or resemblance, quote-unquote-- well, I took a little liberty with the quote, your Honor, but in essence that's what he said. If the Court wants his direct language, I do have it.

Now, to me that's a Brady violation. And in addition to the Rosario violation. Because now you have a

picture that can compare, and he's made the comparison and he says, hmm, doesn't look like him at all, and so I'm not even going to place this in the file. I'll put some innocuous language, but other than that--

And to me, your Honor, that's a Brady violation, because his observation is favorable on the matter of I.D. to Mr. Abraham. And, of course, we'll never have that. And so that is an additional adverse inference with regard to the Brady aspect of it.

THE COURT: Okay. All right. There again, I'm going to craft an adverse inference charge, and I will read it to you before I-- before summations.

MR. WALTERS: Additionally--

THE COURT: Anythings else, Mr. Walters?

MR. WALTERS: Yes, your Honor.

THE COURT: Let me--

Do the People want to be heard about that, or not?

MR. MOBILIA: Your Honor, I don't believe it was Detective Lutz who looked at the people and said it resembles, it was the witness, Sammy Howard, that said it resembled the person who he said robbed him. It wasn't Detective Lutz that made that determination.

THE COURT: But the point was that it didn't resemble.

Go ahead, Mr. Walters.

MR. WALTERS: Your Honor, with respect to the CJI instruction revised as of 2018 regarding one witness, of course there are some People V Boon language, and I note what they indicate with regard to that language, but I would like to have supplemental language with regard to the cross-racial aspect.

THE COURT: There again, you can submit whatever you want, but my inclination would be to give the language that they crafted in response to that case, which is in the Pattern Jury Instructions.

And also, there is also, if you notice just before that, I don't know if you have it right in front of you, but there was a portion where I would discuss with the jury suggestiveness and how the defendant was identified.

MR. WALTERS: Yes, your Honor. I know that there was an instruction, probably more custom and practice than anything, but there's an instruction based upon the social science and empirical data research that says that confidence does not equal accuracy. I'm not sure whether that's incorporated or whether--

THE COURT: I don't recall reading that. I think they use that empirical evidence to craft this charge to the jury. And that's the result of the Pattern Jury

Instruction committee.

MR. WALTERS: I will look again, your Honor, and reflect over the weekend.

THE COURT: Okay.

MR. WALTERS: But I know some of the old I.D. charges used to ask the jury to also evaluate the level of confidence. And, of course, that's now forboden because it's just not true, and I want to be on the lookout for that, your Honor.

I think that's all for now, your Honor.

THE COURT: Okay.

Anything specific by the People?

MR. TANNOUSIS: No, Judge.

THE COURT: All right, so have a good weekend and I will see you 10:00 on Monday morning. Thank you.

MR. WALTERS: Thank you, Judge.

MR. TANNOUSIS: Thank you, your Honor.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.

Karyn S. Gutkin

KARYN S. GUTKIN
Senior Court Reporter

kg